## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **PROFESSIONAL MAINTENANCE SYSTEMS, INC.,** 3717 Boston Street, No. 332 Baltimore, Maryland 21224 | |
| *Plaintiff,* | |
| v. | |
| **BALTIMORE COUNTY, MARYLAND,** 400 Washington Avenue Towson Maryland 21204 | **Civil Action No. _____** |
| and | |
| **PRELOAD, LLC,** 4000 Tower Road Louisville, Kentucky 40219 | |
| *Defendants.* | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Professional Maintenance Systems, Inc. ("PMSI"), by and through its undersigned counsel, Jamar R. Brown and Brooke A. Hutchins of Rosenberg Martin Greenberg, LLP, brings this action against Defendants, Baltimore County, Maryland (the "County") and Preload, LLC ("Preload"), and states as follows:

### INTRODUCTION

1.      This action arises from PMSI's wrongful termination as a minority business enterprise ("MBE") subcontractor for the County's construction of three finished water storage tanks at a site in Fullerton, Maryland (the "Fullerton Reservoirs").

2.      Completed in 2020 and costing more than $75,000,000 to construct, the Fullerton Reservoirs hold more than 63 million gallons of drinking water, providing a sustainable water supply for approximately 315,000 residents of the County and the City of Baltimore.

3.      The County managed the design and construction of Fullerton Reservoirs and other associated work (the "Fullerton Reservoir Project" or the "Project") through its official competitive bidding procurement process. The County's Invitation for Bids made clear that the Fullerton Reservoir Project was subject to certain MBE utilization goals. Under County law, the County seeks an overall percentage of the total dollars spent on discretionary procurements to be awarded to and performed by MBE and women business enterprise ("WBE") firms. The Fullerton Reservoir Project had a 20% MBE/WBE utilization goal.

4.      In response to the Invitation for Bids, Preload, a prospective prime contractor and bidder for the Project, requested that PMSI submit a subcontractor proposal to apply damp proofing and waterproofing to the tank and vault structures of the reservoirs. PMSI is an MBE contractor, certified through the Maryland Department of Transportation, the City of Baltimore, and other certifying bodies, and is engaged in the business of cleaning, coating, and painting highway bridges, highway noise-reduction and retaining walls, and industrial buildings and infrastructure throughout the Mid-Atlantic and Southeast regions of the United States.

5.      As requested, PMSI gave Preload a proposal to perform the damp proofing of the tanks at a price of $3.15 per square foot, the damp proofing of the vaults at $4.05 per square foot, and waterproofing at a price of $3.50 per square foot (the "Subcontract Proposal").

6.      Having submitted its Subcontract Proposal to Preload, Preload and PMSI executed the County's Form C in which Preload certified that it and PMSI would enter into a subcontract consistent with the Subcontract Proposal upon Preload's execution of a contract with the County

for the Project. As part of its official procurement competitive bidding process, the County requires that any prospective prime contractor and bidder include an executed Form C in its bid for a County procurement contract. By executing the Form C, Preload accepted PMSI's Subcontract Proposal. Accordingly, PMSI expected to be awarded a subcontract for damp proofing and waterproofing the tank and vault structures in the event the County awarded Preload the contract for the Project.

7.      Prior to Preload submitting the executed Form C with its prime bid for the Project, and without PMSI's knowledge or consent, Preload listed a significantly lower price on the Form C for the amount to be paid PMSI for its work than the price set forth in the Subcontract Proposal. Preload then submitted that Form C containing the entirely fabricated subcontract price with its bid for the Project (the "Bid").

8.      One year later, PMSI learned that, unbeknownst to it, the County had accepted Preload's Bid with PMSI named as its MBE subcontractor to perform the waterproofing, damp proofing, and coating of the tank structures and awarded Preload its procurement contract for the Fullerton Reservoir Project identified as Contract No. 16047 WX0 (the "Contract"). Preload did not initially notify PMSI that its Bid had been accepted and that Preload had entered into the Contract with the County.

9.      Upon PMSI requesting that Preload provide an update on the status of its subcontract after learning that the County had accepted Preload's Bid and awarded Preload the Contract, Preload then sought to renegotiate the terms of PMSI's subcontract, offering to pay PMSI much less than the price set forth in the Subcontract Proposal and much less than the fabricated price stated in the Form C. Preload initially presented PMSI a proposed subcontract purporting to pay it a flat rate of $2.10 per square foot for all damp proofing and waterproofing and later

presented a revised proposed subcontract purporting to pay PMSI a flat rate of $2.62 per square foot for that work.

10.     After PMSI rejected both proposals as below the price it proposed for the work which Preload accepted, and having failed to comply with its certification in the Form C that it would enter into a subcontract with PMSI for the Project, Preload then embarked on a malicious campaign aimed at convincing the County to terminate PMSI as the MBE subcontractor.

11.     In support of this pernicious effort, Preload manufactured false allegations that PMSI had sustained performance issues in connection with work it was performing pursuant to another subcontract for the Project. Although these claims were objectively baseless and completely refuted, the County nevertheless acted upon them. The County ultimately acquiesced to Preload's request and approved Preload's modified MBE plan in which Preload replaced PMSI with a different subcontractor.

12.     There was simply no legal basis for PMSI's termination as the MBE subcontractor for the Project. Preload used PMSI's MBE status and expertise to obtain the Contract and was therefore required to enter into a subcontract with PMSI for the work and price as stated in the Subcontract Proposal in accordance with the Form C. Preload failed to enter into a subcontract with PMSI in violation of its certification in the Form C and the County's competitive bidding procurement policies and procedures. Rather than enforce Preload's certification and—by extension—its own policies and procedures, the County conspired with Preload to wrongfully terminate PMSI from the Project without good cause.

13.     Preload and the County's actions were both unconstitutional and discriminatory and unjustly deprived PMSI of due process, equal protection under the law, and a profitable economic opportunity. As a direct result of Preload and the County's arbitrary, capricious, and fraudulent

conduct, PMSI suffered damages of more than $900,000 in lost profits. PMSI seeks redress pursuant to the Fourteenth Amendment and related tort and contract causes of action. This action seeks money damages.

## PARTIES

14.     Plaintiff, Professional Maintenance Systems, Inc. ("PMSI"), is a Maryland corporation. Its principal office is located at 3717 Boston Street, No. 332, Baltimore, Maryland 21224. PMSI is a certified MBE contractor through the Maryland Department of Transportation and the City of Baltimore.

15.     Defendant, Baltimore County, Maryland (the "County"), is a municipal corporation organized under the laws of the state of Maryland. The County is a recipient of state and federal funds.

16.     Defendant, Preload, LLC ("Preload"), is a Kentucky limited liability company. Its principal office is located at 4000 Tower Road, Louisville, Kentucky 40219. Preload is the prime contractor for the Fullerton Reservoir Project.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 3613 and 12133, because PMSI seeks redress for violations of the United States Constitution and federal civil rights law.

18.     This Court has supplemental jurisdiction over PMSI's state law claims pursuant to 28 U.S.C. § 1367.

19.     The relief requested is authorized by 42 U.S.C. §§ 1983 and 1988.

20.     Venue is proper under 28 U.S.C. § 1391(b), because all of the claims and events giving rise to this action occurred in this District.

21.     Section 5–304 of the Local Government Tort Claims Act does not apply because PMSI notified the County of its injury and the circumstances giving rise to its injury on or about March 12, 2019.

## FACTS COMMON TO ALL COUNTS

### *The County's Minority and Women's Enterprise Program*

22.     Pursuant to the County's Executive Order dated June 4, 2009, governing the use of MBE and WBE firms in County procurement contracts (the "Executive Order"), the Baltimore County Minority and Women's Business Enterprise Program (the "MBE/WBE Program") was established to maximize opportunities for minority and women owned businesses to participate in the County's procurement contracts.[1]

23.     Under Section 2 of the Executive Order, the County seeks to have an overall goal of 15% of the cumulative total of all discretionary dollars spent in a fiscal year on County procurements awarded to and/or performed by MBE and WBE firms.

24.     Section 6 of the Executive Order requires that at the time of submission all bidders on a County procurement contract must submit (i) a list of all subcontractors contacted in preparation of their bid package or proposal, including the service to be performed, the bid amount, and the race, ethnicity, and gender of the business owners; and (ii) a list of all subcontractors to be used on a County contract, including all MBE or WBE subcontractors, the service to be performed, the total amount to be paid, and the race, ethnicity, and gender of the owner.

25.     The Baltimore County, Maryland Use of Minority Business Enterprise and Women's Business Enterprises in County Contracts Guidelines (the "MBE/WBE Guidelines")

---

[1] The Executive Order has since been superseded by Executive Order 2017-003 dated July 27, 2017. The provisions relevant to this action are identical in both orders.

mandate that if a solicitation includes an MBE or WBE subcontract goal, all bidders must demonstrate a good faith effort to meet the goals established in a bid for a project by completing and signing an MBE/WBE Disclosure and Participation Statement (also known as a "Form C"), among other required MBE/WBE forms (collectively, the "MBE Plan").

26.     The Form C sets forth in relevant part (i) the name of the County procurement project, (ii) the name of the name of the prime contractor, (iii) the name of the MBE/WBE subcontractor whom the prime contractor will employ if awarded the County contract, (iv) the work to be performed by the MBE/WBE subcontractor, and (v) the amount of money to be paid the MBE/WBE subcontractor under the subcontract.

27.     The Form C must be executed by both the prime contractor and the MBE/WBE subcontractor and expressly provides that by executing it, the prime contractor and MBE/WBE subcontractor agree that they *must* enter into a subcontract for the work provided on the form should the County award the prime contractor the procurement contract:

> The undersigned MBE/WBE subcontractor and prime contractor *will* enter into a contract for the work/service indicated above upon the prime contractor's execution of a contract for the above referenced project with [] Baltimore County. The undersigned subcontractor is a MDOT or Baltimore City certified MBE/WBE. The terms and conditions stated are consistent with our agreements.

(Emphasis added.)

28.     Consistent with state and federal procurement regulations, the MBE/WBE Guidelines further provide that after the County has awarded a contract to the prime contractor, the County may require the prime contractor to submit alternative plans for fulfilling the required MBE/WBE participation under the contract only "[i]f an MBE/WBE is disqualified by any public entity, including but not limited to, Baltimore City, the State or MDOT, at any time after award or during the term of the contract." The MBE/WBE Guidelines do not permit a prime contractor to

change its MBE Plan after a contract has been awarded or during the term of the contract under any other circumstances.

29.     Under the Code of Maryland Regulations ("COMAR") 21.11.03.12.E, after a prime contractor is awarded a contract, the prime contractor "may not terminate or otherwise cancel the contract of a certified MBE listed on the MBE participation schedule" unless there exists "documented nonperformance by the certified MBE or election by the certified MBE to cease work on the contract."

30.     Pursuant to 49 C.F.R. § 26.53, a prime contractor is prohibited from terminating a disadvantaged business enterprise ("DBE") subcontractor that was listed as participating in a contract, or from replacing the DBE subcontractor with another DBE firm, unless the prime contractor can show that the listed DBE subcontractor: (i) failed or refused to execute a reasonable written contract; (ii) failed to perform the work of its subcontract in a way consistent with normal industry standards absent bad faith or discrimination of the prime contractor; (iii) failed or refused to meet the prime contractor's reasonable, nondiscriminatory bond requirements; (iv) became bankrupt, insolvent, or exhibits credit unworthiness; (v) was ineligible to work on public works projects because of suspension and debarment proceedings; (vi) was not a responsible contractor; (vii) voluntarily withdrew from the project and provided written notice of its withdrawal; (viii) was ineligible to receive DBE credit for the type of work required; or (ix) died or became disabled making completion of the work on the contract impossible.

*The Fullerton Reservoir Project*

31.     On or around June 17, 2016, the County posted an Invitation for Bids for the Fullerton Reservoir Project and set the bid opening date for August 25, 2016.

32.     The Invitation for Bids made clear that the Project was subject to MBE utilization goals, stating in all caps:

> THE PROJECT IS SUBJECT TO A MINORITY BUSINESS ENTERPRISE UTILIZATION GOAL AND FEMALE CONTRACTORS UTILIZATION GOALS. THESE GOAL REQUIREMENTS ARE MORE FULLY EXPLAINED IN THE SPECIFICATIONS. THE MBE/WBE FORMS IN THE PROPOSAL BOOKLET MUST BE COMPLETED AND SUBMITTED AT THE TIME OF BID OPENING.

33.     The Baltimore County, Maryland Certified MBE/WBE Utilization and Fair Solicitation Affidavit (also known as a "Form A"), which was included in the specifications for the Fullerton Reservoir Project, provided for a 20% MBE/WBE overall utilization goal.

34.     In response to the County's Invitation for Bids, Preload requested that PMSI submit a subcontractor proposal to apply damp proofing and waterproofing coating to the constructed reservoir tanks.

35.     On or about August 24, 2016 and August 25, 2016, PMSI submitted its Subcontract Proposal to Preload in which it proposed to perform damp proofing of the tanks at a price of $3.15 per square foot, damp proofing of the vaults at a price of $4.05 per square foot, and waterproofing coating at a price of $3.50 per square foot. Pursuant to the Subcontract Proposal, the unit prices included PMSI's labor costs.

36.     Preload and PMSI both executed the Form C. The Form C is attached hereto as Exhibit 1.

37.     By executing the Form C, Preload accepted PMSI's Subcontract Proposal and certified in writing that Preload and PMSI had reached an agreement regarding the work PMSI would perform in connection with the Project and the price it would be paid for that work.

38.     The Form C identified Preload as the prime contractor and PMSI as the MBE subcontractor to perform "coatings, damp proofing, [and] waterproofing" for the Fullerton Reservoir Project.

39.     Pursuant to the Form C, Preload and PMSI expressly agreed that they "will enter into a contract for the [coatings, damp proofing, and waterproofing] upon the prime contractor's execution of a contract for the [Fullerton Reservoir Project] with [] Baltimore County" and that "[t]he terms and conditions stated [in the Form C] are consistent with [Preload and PMSI's] agreements." Preload became contractually obligated to enter into a subcontract with PMSI for the damp proofing and waterproofing that PMSI had proposed to perform.

*Preload's Falsification of the Form C by Reducing Subcontract Price Prior to Submission*

40.     Prior to submitting the Bid and without PMSI's knowledge or consent, Preload falsified the Form C by providing a price that PMSI would be paid under the subcontract for the damp proofing and waterproofing that was much lower than the price set forth in PMSI's Subcontract Proposal. Based on the unit prices stated in PMSI's Subcontract Proposal and the square footage of the tanks to be coated, PMSI was entitled to and expected to receive a subcontract price totaling at least $1,256,310 for the damp proofing alone.[2] However, Steven J. Dudle, District Sales Manager for Preload, falsely inserted a completely arbitrary subcontract price of $1,084,150, a difference of more than $170,000, without the consent or knowledge of PMSI.

41.     Although PMSI's Subcontract Proposal, which Preload accepted by executing the Form C, had clearly set forth a separate unit price for the damp proofing, *i.e.*, $3.15 per square foot for the tanks and $4.05 per square foot for the vaults, and a separate unit price for the

---

[2] Preload provided PMSI an estimated total square footage of 81,000 square feet per tank and 40,000 square feet per vault for the damp proofing. Preload did not provide PMSI a square footage estimate for the waterproofing.

waterproofing, *i.e.*, $3.50 per square foot, Preload unilaterally and without PMSI's knowledge or consent, fabricated a single arbitrary unit price for all aspects of PMSI's work in the amount of $3.05 per square foot, resulting in the significantly lower subcontract price.

42.     Unbeknownst to PMSI, on or around August 26, 2016, Preload submitted its Bid to the County's Purchase Division of the Office of Budget and Finance and included with it the Form C reflecting the falsely reduced subcontract price.

*Preload's Scheme to Renegotiate PMSI's Subcontract Price After Contract Award*

43.     Nearly one year later, on or about August 25, 2017, a representative of County's MBE/WBE Program informed PMSI that the County had accepted Preload's Bid with PMSI named as its MBE subcontractor for damp proofing and waterproofing the tanks in connection with the Project. Consistent with PMSI's expectations and in accordance with Preload's acceptance of the Subcontract Proposal, the County also informed PMSI that the amount of its subcontract as per the Bid was $1.2 million.

44.     Upon discovering this information, by email dated August 25, 2017, Arien Moore, President of PMSI, requested that Rusty Spangler, Preload's Estimating Manager, have Preload's onsite representative contact him because PMSI was listed as Preload's MBE subcontractor for $1.2 million on the damp proofing of the tanks.

45.     Five days later, by email dated August 30, 2017, Sean Vorsteg, Project Engineer for Preload and PMSI's designated point of contact for the contractor, advised Mr. Moore that Preload had been awarded the Contract. Mr. Moore responded by email that same day and asked to "discuss the entire scope of the project and amount [because] [t]he county MBE office told me Friday that we were used in the bid for $1.2 million."

46.     In response, by e-mail dated August 30, 2017, Mr. Vorsteg advised Mr. Moore for the first time that there was a discrepancy concerning the amount of PMSI's subcontract, writing: "Right now Preload has submitted to Baltimore Counties [sic] MBE office for $741,150.00 but the quote I have on our network is $255,150.00 per tank (so $765,450.00)." Mr. Vorsteg then inquired, "Is there an updated quote that I don't have?"

47.     Because Preload had itself submitted the Form C in which it had fraudulently reduced PMSI's subcontract contract price to $1,084,150, there was simply no basis for Preload to claim one year later that it was somehow uncertain about the subcontract price that Preload itself had submitted to the County in its Bid.

48.     Undeterred in its scheme, Preload sought to pay PMSI far less than even the fraudulently reduced subcontract price that it had already fabricated on the Form C which the County accepted.

49.     On or about June 18, 2018, Mr. Vorsteg, acting on behalf of Preload, presented PMSI with a proposed subcontract (the "First Revised Subcontract") purporting to pay PMSI a total subcontract price of $741,150 or $2.10 per square foot for damp proofing the tanks and painting the sides and roofs of the tanks consisting of a coating area totaling 352,395 square feet. A copy of the First Revised Subcontract is attached hereto as Exhibit 2.

50.     PMSI rejected the First Revised Subcontract, explaining that its price was significantly and unreasonably lower than both the Subcontract Proposal, which Preload accepted by executing the Form C prior to submitting its Bid, and the reduced subcontract price that Preload submitted to the County in the Form C.

51.     Continuing along in Preload's scheme to defraud PMSI of the subcontract price it was entitled to receive as the MBE subcontractor, by email dated June 27, 2018, Mr. Vorsteg claimed that the most recent quote from PMSI was for $3.05 per square foot for coating the tanks.

52.     Mr. Vorsteg's claim was demonstrably false given that PMSI never gave Preload any proposal for $3.05 per square foot.

53.     Nevertheless, his email confirmed that despite agreeing to PMSI's Subcontract Proposal, which set forth different unit pricing for the damp proofing and waterproofing, Preload submitted a Bid to the County arbitrarily and fraudulently pricing PMSI at the fabricated unit price of $3.05 per square foot for *all* of PMSI's work under the subcontract, resulting in the artificially reduced subcontract price to be paid to PMSI.

54.     Mr. Vorsteg's email also confirmed that there was no lawful basis for Preload to have proposed the First Revised Subcontract just nine days earlier, offering to pay PMSI almost a dollar less per square foot than the quote it supposedly had on file.

55.     By a subsequent email also dated June 27, 2018, Mr. Vorsteg, acting on behalf of Preload, presented PMSI with a second revised subcontract (the "Second Revised Subcontract"). A copy of the Second Revised Subcontract is attached hereto as Exhibit 3.

56.     The Second Revised Subcontract removed any reference to the total square footage and purported to pay PMSI a lump sum price of $924,570 or $2.62 per square foot based on the total square footage in the First Revised Subcontract.

57.     When PMSI expressed concern that the Second Revised Subcontract's price was also considerably lower than both the Subcontract Proposal and the reduced subcontract price that Preload submitted to the County in the Form C, a representative for Preload blithely responded

-13-

that "this was enough money for PMSI" despite Preload and PMSI's prior agreement and certification as stated in the Form C.

58.     Consequently, PMSI also rejected the Second Revised Subcontract because it purported to pay PMSI a price lower than the price PMSI originally proposed for the work and the price stated on the Form C.

59.     Further demonstrating Preload's scheme to defraud PMSI into accepting a lower subcontract price than the price set forth in the Subcontract Proposal and the price stated on the Form C, in or around August 2018, Mr. Vorsteg told Mr. Moore that Preload "was screwing PMSI out of a contract, [] because Preload found a way to perform the Minority Scope of Work for cheaper."

60.     On or about October 1, 2018, Preload purported to cease contract negotiations with PMSI after claiming that PMSI had failed to submit a timely counterproposal to the Second Revised Subcontract, which it was under no obligation to do in the first instance. Preload also notified PMSI that it had submitted a revised MBE Plan to the County seeking its approval to enter into a subcontract with another MBE subcontractor for the damp proofing and waterproofing for the Project.

*Preload's Effort to Terminate PMSI as the MBE Subcontractor by Defamation*

61.     After its efforts to defraud PMSI into accepting an unreasonably and arbitrarily lower subcontract price for its work were unsuccessful and having failed to comply with Form C certification that it would enter into a subcontract with PMSI for the Project in violation of the MBE/WBE Guidelines, Preload embarked on a malicious campaign aimed at convincing the County to unjustly terminate PMSI as Preload's MBE subcontractor.

62.     In support of this pernicious effort, Preload manufactured false allegations that PMSI had displayed certain performance issues in connection with work it was performing pursuant to another subcontract it had been awarded for the Project.

63.     PMSI had entered into a separate subcontract with Allan Meyers, another contractor involved with the Project, for damp proofing the vault structures of the Fullerton Reservoirs.

64.     In a letter to Allan Myers dated February 6, 2019, Keith Dorsey, Director of the Office of Budget and Finance for the County, confirmed that "Preload has indicated that PMSI's performance on the project has been unsatisfactory with problems occurring on multiple occasions." Mr. Dorsey requested that the contractor provide a written response assessing PMSI's performance on the contract.

65.     By letter dated February 15, 2019, Allan Myers responded to the County's request and specifically refuted Preload's claims, stating that PMSI's performance on the subcontract had in fact been satisfactory.

66.     However, the County had already acted upon Preload's false and defamatory claims regarding PMSI's performance by that time.

67.     On or about January 29, 2019, the County informed PMSI that on January 15, 2019, it had approved Preload's "modified MBE Plan that utilizes an alternate MBE Subcontractor" and stated that its basis for the decision was "in order for Baltimore County to reach expected deadlines for project completion." The County also based its decision to terminate PMSI on the dispute concerning the amount of PMSI's subcontract price that Preload completely contrived as a pretext to defraud PMSI into accepting a lower subcontract price than the parties had previously agreed to and seek PMSI's termination as an MBE on the Contract if it refused to accept the lower subcontract price.

68.     The County's decision to approve the modified MBE Plan officially terminated PMSI as an MBE subcontractor for the Project. That decision was not based on any determination by the County that PMSI was disqualified by any public entity, including but not limited to, Baltimore City, the State or MDOT, at any time after award or during the term of the contract, or that any other accepted good cause existed.

69.     Based on the County's MBE/WBE Guidelines, as well as state and federal regulations, there was no cause for the County to terminate PMSI as an MBE subcontractor after it had already awarded the Contract to Preload.

*The County's Refusal to Enforce its MBE/WBE Guidelines*

70.     In an effort to appeal PMSI's wrongful termination as an MBE subcontractor on the Project, on March 12, 2019, representatives of PMSI and the Maryland Washington Minority Contractors Association, Inc. met with the County Executive and other County officials.

71.      During that meeting, PMSI explained that there was no basis for the County to terminate PMSI as an MBE subcontractor and that the decision violated the County's own MBE/WBE Guidelines. PMSI also explained that Preload had violated the County's MBE/WBE Guidelines by falsifying the Form C it submitted with its Bid and fraudulently reducing the subcontract price that PMSI would be paid for its work without PMSI's knowledge and consent and by failing to enter into a subcontract with PMSI consistent with its Subcontract Proposal in accordance with the agreement and certification stated in the Form C. PMSI also rejected Preload's defamatory claims that PMSI had failed to perform its subcontract with Allan Meyers or any other contractor or procuring agency in a satisfactory matter.

72.     For the County's part, Mr. Dorsey admitted that Preload had defamed PMSI by making deceptive and false allegations about PMSI's work history and performance and that the

County had based its decision to approve Preload's modified MBE Plan and terminate PMSI as an MBE subcontractor on this false information. Mr. Dorsey also admitted that Preload had fraudulently violated the its MBE/WBE Guidelines by submitting a Bid with a subcontract price for PMSI that was significantly less than the price PMSI had proposed and that PMSI and Preload had previously agreed upon.

73.     County Executive, John A. Olszewski, Jr., also recognized the County's responsibility in permitting Preload to defraud PMSI by asking at the meeting, "[H]ow can this same scenario be prevented in the future and what did the County miss?"

74.     Mr. Dorsey stated that under normal circumstances Preload would be removed from the Contract for such fraudulent conduct but that it was not in the best interest of the County to take such action because the Project was worth more than $80 million and it was going well. Instead, Mr. Dorsey stated that the County was considering fining Preload for its obvious violation of the County's MBE/WBE Guidelines or issuing it a "Stop Work" order until the matter was resolved.

75.     In a letter dated May 14, 2019, County Attorney, Michael E. Field, stated that the County was determining whether to impose sanctions against Preload for its false and deceptive Bid and reviewing its practices and procedures to prevent a similar situation from arising again. Despite these admissions and the MBE/WBE Guidelines, Mr. Field incorrectly concluded that the County had no mechanism to require Preload to enter into an MBE subcontract with PMSI.

76.     At all times relevant to this action, the County officials, including County Executive Olszewski, County Attorney Field, and Director Dorsey, were acting under color of law.

77.     As a direct consequence of Preload's failure to award PMSI an MBE subcontract in accordance with the Subcontract Proposal and the County's MBE/WBE Guidelines, and the

County's wrongful termination of PMSI as Preload's MBE subcontractor on the Project, PMSI has sustained substantial monetary damages, including but not limited to more than $900,000 in lost profits.

78.     In addition, under 42 U.S.C. § 1988, PMSI is entitled to recover its reasonable attorneys' fees, expert witness fees, and other costs incurred in this action.

## COUNT I
### Violation of the Fourteenth Amendment – Equal Protection (42 U.S.C. § 1983)
### (Against Baltimore County, Maryland)

79.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

80.     The County, acting through its officials, unlawfully approved Preload's modified MBE Plan and terminated PMSI as an MBE subcontractor under the Contract after it had already been awarded and without making any finding that PMSI had been disqualified as an MBE by MDOT or the City of Baltimore or that any other basis for good cause existed justifying its termination. Indeed, the County repeatedly acknowledged that there was no good cause to terminate PMSI.

81.     That Preload refused to enter into a subcontract with PMSI—for either (i) the subcontract price of $3.15 per square foot for damp proofing the tanks and $4.05 per square foot for damp proofing the vaults or (ii) the fabricated contract price that it wrote on the Form C and filed with its Bid of $1,084.150.00—does not constitute good cause under the MBE/WBE Guidelines or any state or federal MBE/WBE/DBE regulations.

82.     The County treated PMSI differently than other similarly situated MBE subcontractors, without any legitimate legislative purpose or rational basis for doing so.

83.     Following the County's award of the Contract, other similarly situated MBE subcontractors would not have been terminated and replaced by another MBE or WBE subcontractor unless the MBE subcontractor was disqualified by a public entity or if the prime contractor demonstrated good cause to terminate and replace the MBE subcontractor.

84.     No other similarly situated MBE subcontractor has been subject to such summary and extralegal termination as an MBE subcontractor on a County procurement contract without good cause and based solely on the prime contractor's malicious and fraudulent scheme to falsely convince the County that the subcontractor's performance warranted its termination.

85.     As historically racially and economically disadvantaged businesses, MBEs and their minority owners, have a constitutional right to be treated equally under the law, and not treated arbitrarily, irrationally or differently than others who are similarly situated.

86.     As the County itself has acknowledged, there was no lawful or rational basis for the County's unequal and selective enforcement of its MBE/WBE Guidelines to deny PMSI an MBE subcontract for the Project that it was entitled to receive based on those same MBE/WBE Guidelines.

87.     As a result of the County's actions, PMSI sustained substantial economic losses, including but not limited to more than $900,000 in lost profits, among other damages.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.      A declaratory judgment decreeing, adjudging, and declaring that the County's termination of PMSI as an MBE subcontractor under the Contract is unlawful under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

B.      A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

C.      A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

## COUNT II
### Violation of the Fourteenth Amendment – Substantive Due Process (42 U.S.C. § 1983)
(Against Baltimore County, Maryland)

88.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

89.     PMSI had a protected property interest in the subcontract that the County terminated. The language in the executed Form C, which provided that "[t]he undersigned MBE/WBE subcontractor and prime contractor *will enter into a contract* for the work/service indicated above upon the prime contractor's execution of a contract for the above referenced project" and that "[t]he terms and conditions stated above are consistent with our agreements," conferred upon PMSI a legitimate claim and right to a subcontract.

90.     PMSI was deprived of its protected property interest in the subcontract without due process of law when the County approved Preload's modified MBE plan replacing PMSI with a different subcontractor.

91.     As set forth in the Executive Order, the goal of the County's MBE/MBE Program is to maximize opportunities for MBE firms to participate in all phases of procurement in the County.

92.     By terminating PMSI as the MBE subcontractor after the Contract was awarded, the County deprived PMSI of its opportunity to participate in a County procurement contract. PMSI was afforded far less procedure than was due by the County for a termination of a MBE subcontractor.

93.     The County's decision to terminate PMSI was based in large measure on Preload's false and defamatory representations to the County that PMSI had performance issues. Although Preload's claims were ultimately proven to be objectively false, PMSI was not afforded any opportunity to formally contest Preload's false allegations concerning its performance and work history prior to the County's decision to approve Preload's modified MBE plan and terminate PMSI from the Contract. The County unilaterally approved Preload's modified MBE Plan replacing PMSI with a different subcontractor on January 15, 2019, but PMSI was not informed of this decision until on January 29, 2019, 14 days later.

94.     Because the County's decision to terminate PMSI was based on Preload's now refuted defamatory claims about PMSI's work performance, not a legitimate basis for termination under the MBE/WBE Guidelines or state or federal regulations, it necessarily has no substantial relationship with the stated purpose of the County's MBE/WBE Program, the Executive Order, or the MBE/WBE Guidelines and further no legitimate government interest.

95.     As a result of the County's actions, PMSI sustained substantial economic losses, including but not limited to more than $900,000 in lost profits, among other damages.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.     A declaratory judgment decreeing, adjudging, and declaring that the County's termination of PMSI as an MBE subcontractor under the Contract is unlawful under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

B.     A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

C.     A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

## COUNT III
### Violation of Article 24 of the Maryland Declaration of Rights – Equal Protection
### (Against Baltimore County, Maryland)

96.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

97.     Article 24 of the Maryland Declaration of Rights is the state constitutional analog to the Fourteenth Amendment to the United States Constitution and is therefore read *in pari materia* with its federal counterpart.

98.     The equal protection rights afforded by the Fourteenth Amendment to the United States Constitution are embodied in Article 24 of the Maryland Declaration of Rights.

99.     For the reasons set forth above, the County violated the equal protection guarantee of Article 24 of the Maryland Declaration of Rights under color of law by unlawfully approving Preload's modified MBE Plan and terminating PMSI as an MBE subcontractor after the Contract award without first making any finding that PMSI had been disqualified as an MBE by MDOT or the City of Baltimore or that any other basis for good cause existed justifying PMSI's termination.

100.     As a result of the County's actions, PMSI sustained substantial economic losses, including but not limited to more than $900,000 in lost profits, among other damages.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.      A declaratory judgment decreeing, adjudging, and declaring that the County's termination of PMSI as an MBE subcontractor under the Contract is unlawful under Article 24 of the Maryland Declaration of Rights;

B.      A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

C.      A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

**COUNT IV**
**Violation of Article 24 of the Maryland Declaration of Rights – Due Process**
**(Against Baltimore County, Maryland)**

101.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

102.    The due process protections in Article 24 are also read *in pari materia* with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

103.    For the reasons set forth above, the County violated PMSI's substantive due process rights under Article 24 of the Maryland Declaration of Rights under color of law by unlawfully approving Preload's modified MBE Plan and terminating PMSI as an MBE subcontractor after the Contract award without first making any finding that PMSI had been disqualified as an MBE by MDOT or the City of Baltimore or that any other basis for good cause existed justifying PMSI's termination.

104.     The County's decision to terminate PMSI was based on Preload's now refuted defamatory claims about PMSI's work performance, not a legitimate basis for termination under the MBE/WBE Guidelines or state or federal regulations.

105.     The County's action has deprived PMSI of property without due process of law.

106.     As a result of the County's actions, PMSI sustained substantial economic losses, including but not limited to more than $900,000 in lost profits, among other damages.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.     A declaratory judgment decreeing, adjudging, and declaring that the County's termination of PMSI as an MBE subcontractor under the Contract is unlawful under Article 24 of the Maryland Declaration of Rights;

B.     A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

C.     A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

### COUNT V
### Fraudulent Inducement
### (Against Preload, LLC)

107.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

108.     Preload knowingly and intentionally made false representations to PMSI that (i) it would include in its Bid the subcontract price that PMSI had proposed in its Subcontract Proposal, *i.e.*, $3.15 per square foot for damp proofing the tanks and $4.05 per square foot for damp proofing

the vaults, and $3.50 per square foot for waterproofing and (ii) that Preload and PMSI would enter into a subcontract upon Preload's execution of the Contract with the County.

109.     However, Preload knew all along that it was going to submit a bid based on an entirely different price of $3.05 per square foot for all scopes of PMSI's work and that it would not enter into a subcontract with PMSI unless PMSI agreed to perform the work at a much lower price than PMSI provided in its Subcontract Proposal which Preload agreed to by executing the Form C.

110.     Preload misrepresented that it would include in its Bid PMSI's proposed subcontract price and that it would enter into a subcontract with PMSI for that price for the purpose of defrauding PMSI into executing the Form C.

111.     Preload knew that to meet the minimum requirements for consideration of its Bid, the County's MBE/WBE Guidelines required both PMSI and Preload to sign the Form C.

112.     PMSI was in fact deceived by Preload's misrepresentation, as it had no reason to suspect that Preload would not submit the agreed upon subcontract price for its work in its Bid or that Preload would fail to enter into a subcontract with it based on an entirely contrived dispute about the subcontract price.

113.     PMSI reasonably and justifiably relied on Preload's misrepresentation to its detriment. Had PMSI known that Preload did not intend to submit the agreed upon subcontract price, PMSI would not have submitted the Subcontract Proposal to Preload.

114.     As a result of the County's actions, PMSI sustained substantial economic losses, including but not limited to more than $900,000 in lost profits, among other damages.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.     A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

B.     A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

## COUNT VI
## Fraudulent Misrepresentation
### (Against Preload, LLC)

115.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

116.   Preload knowingly and intentionally made false representations to PMSI that (i) it would include in its Bid the subcontract price that PMSI had proposed in its Subcontract Proposal, *i.e.*, $3.15 per square foot for damp proofing the tanks and $4.05 per square foot for damp proofing the vaults, and $3.50 per square foot for waterproofing and (ii) that Preload and PMSI would enter into a subcontract upon Preload's execution of the Contract with the County.

117.   However, Preload knew all along that it was going to submit a bid based on an entirely different price of $3.05 per square foot for all scopes of PMSI's work and that it would not enter into a subcontract with PMSI unless PMSI agreed to perform the work at a much lower price than PMSI provided in its Subcontract Proposal which Preload agreed to by executing the Form C.

118.   Preload misrepresented that it would include in its Bid PMSI's proposed subcontract price and that it would enter into a subcontract with PMSI for that price for the purpose of defrauding PMSI into executing the Form C.

119.    Preload knew that to meet the minimum requirements for consideration of its Bid, the County's MBE/WBE Guidelines required both PMSI and Preload to sign the Form C.

120.    PMSI was in fact deceived by Preload's misrepresentation, as it had no reason to suspect that Preload would not submit the agreed upon subcontract price for its work in its Bid or that Preload would fail to enter into a subcontract with it based on an entirely contrived dispute about the subcontract price.

121.    PMSI reasonably and justifiably relied on Preload's misrepresentation to its detriment. Had PMSI known that Preload did not intend to submit the agreed upon subcontract price, PMSI would not have submitted the Subcontract Proposal to Preload

122.    As a result of the County's actions, PMSI sustained substantial economic losses, including but not limited to more than $900,000 in lost profits, among other damages.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.      A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

B.      A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

**COUNT VII**
**<u>Tortious Interference with Business Relationships</u>**
**(Against Preload, LLC)**

123.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

124.     After failing to comply with its agreement that it would enter into a subcontract with PMSI for the Project, Preload embarked on a calculated smear campaign aimed at convincing the County to terminate PMSI as the MBE subcontractor.

125.     In support of this pernicious effort, Preload intentionally and willfully told County officials that PMSI had certain performance issues in connection with work it was performing pursuant to another subcontract for the Project.

126.     The allegations were ultimately completely refuted.

127.     Nonetheless, Preload manufactured and spread the false allegations with the unlawful and malicious purpose of causing damage and loss to PMSI.

128.     As a direct result of Preload's intentional, willful, and malicious acts, the County approved Preload's modified MBE plan in which Preload replaced PMSI with a different subcontractor and terminated PMSI.

129.     As a result of Preload's actions, PMSI sustained substantial economic losses, including but not limited to more than $900,000 in lost profits, among other damages.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.     A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

B.     A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

**COUNT VIII**
**Injurious Falsehood**
**(Against Preload, LLC)**

130.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

131.    PMSI has a protected property interest in the MBE subcontract that the County terminated. PMSI's right to the subcontract is based on the Form C, which Preload and PMSI executed and which required PMSI and Preload to enter into a subcontract upon Preload's execution of the Contract with the County.

132.    In order to convince the County to terminate PMSI as the MBE subcontractor, Preload falsely and deliberately informed County officials that PMSI had certain performance issues in connection with work it was performing pursuant to another subcontract for the Project.

133.    Preload made these statements to the County knowing that they were absolutely false.

134.    Preload expected the false statements to reflect poorly on PMSI's rights to the subcontract.

135.    The false statements induced the County to approve Preload's modified MBE plan and terminate PMSI, replacing it with a different subcontractor.

136.    As a result of Preload's actions, PMSI has suffered special damages of lost profits of more than $900,000.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.    A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

-29-

B.      A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

### COUNT IX
### Breach of Contract
### (Against Preload, LLC)

137.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

138.    On August 24, 2016 and August 25, 2016, PMSI submitted the Subcontract Proposal to Preload offering to perform the damp proofing at a price of $3.15 per square foot for the tanks and $4.05 per square foot for the vaults and the waterproofing at a price of $3.50 per square foot.

139.    By executing the Form C, Preload accepted PMSI's Subcontract Proposal.

140.    Pursuant to the Form C, Preload and PMSI further agreed that both parties would enter into a written subcontract consistent with the Subcontract Proposal upon Preload's execution of the Contract.

141.    Preload breached its agreement with PMSI by fraudulently fabricating a reduced subcontract price that PMSI would be paid for its work without PMSI's knowledge and consent.

142.    Preload further breached its agreement with PMSI by failing to enter into a subcontract with PMSI in accordance with the agreement and certification in the Form C and entering into a contract with a different subcontractor.

143.    As a result of Preload's breach, PMSI suffered a loss of more than $900.00 in lost profits.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.      A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

B.      A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

## COUNT X
### Unjust Enrichment
**(Against Preload)**

144.      Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

145.      By executing the Form C and allowing Preload to submit a Bid naming PMSI as its MBE subcontractor, PMSI conferred a benefit upon Preload.

146.      Preload appreciated and fully recognized the benefit that it received by using PMSI as its MBE subcontractor.

147.      Preload knew that the MBE/WBE Guidelines required it to submit an MBE Plan, including a Form C executed by an MBE subcontractor, in order to meet the minimum qualifications for the County to consider its Bid.

148.      Preload also knew that the Project was subject to MBE/WBE utilization goals and that PMSI's agreement to perform work as an MBE subcontractor allowed Preload to meet those goals.

149.      In exchange for these benefits that PMSI had conferred, Preload agreed to enter into a subcontract with PMSI for the agreed upon subcontract price.

150.    However, Preload never entered into a subcontract with PMSI after the County accepted its Bid naming PMSI as its MBE subcontractor and awarded it a Contract.

151.    Preload has been unjustly enriched by retaining the benefit of a successful Bid and Contract award without paying PMSI the value of that benefit as agreed.

152.    An inequity will result if Preload is not required to pay PMSI for the benefit it conferred.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

C.    A monetary judgment for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

D.    A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

**COUNT XI**
**Civil Conspiracy**
**(Against Both Defendants)**

153.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if repeated fully in this paragraph.

154.    Preload and the County clearly had a meeting of the minds to wrongfully terminate PMSI as the MBE subcontractor for the County's Fullerton Reservoir Project.

155.    In furtherance of this goal, Preload manufactured false allegations that PMSI had certain performance issues in connection with work it was performing pursuant to another subcontract for the Project and submitted a modified MBE Plan for the County's approval removing PMSI as the MBE subcontractor. Preload also contrived a dispute about the subcontract

price that PMSI should accept for its work even though Preload and PMSI had already agreed on that price.

156.    For its part, the County ignored the evidence refuting Preload's baseless claims about PMSI's work performance without ever giving PMSI an official forum to protest them prior to its decision terminating PMSI. The County also failed to enforce its own MBE/WBE Guidelines requiring that PMSI and Preload enter into a subcontract upon Preload's execution of the County's Contract as set forth in the Form C. Consummating the plan, the County unlawfully approved Preload's modified MBE Plan replacing PMSI with a different subcontractor and terminated PMSI without any finding of good cause.

157.    As a result of the actions of these Defendants, PMSI suffered a loss of more than $900.000 in lost profits that it would have earned had it not been terminated from the Contract.

WHEREFORE, Plaintiff demands that Court grant and enter the following relief:

A.    A monetary judgment against both Defendants, jointly and severally, for compensatory damages in an amount exceeding $900,000.00, plus costs and attorneys' fees to the extent permitted by law, and for punitive damages in an amount to be determined at trial; and

B.    A judgement granting such other, further and different relief as this Court deems just, proper and equitable, including but not limited to the relief sought in any of the other counts of this Complaint.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,


*/s/ Jamar R. Brown*
Jamar R. Brown (Fed. Bar No. 19522)
Brooke A. Hutchins (bar admission pending)
Rosenberg Martin Greenberg, LLP
25 S. Charles Street, 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Facsimile: (410) 727-1115
jbrown@rosenbergmartin.com
bhutchins@rosenbergmartin.com

*Attorneys for Plaintiff,*
*Professional Maintenance Systems, Inc.*


4886-4652-4929